1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

**\*\*\***

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

GAVIN STEPHEN PHILLIPS,

          Defendant.

2:18-cr-00228-RCJ-VCF

**ORDER AND REPORT AND RECOMMENDATION**

MOTION TO SUPPRESS [ECF NO. 25], MOTION TO FILE SURREPLY [ECF NO. 35]

11

12

13

14

Before the Court is Defendant Gavin Phillips' Motion to Suppress (ECF No. 25) and the Government's Motion to File Surreply to Defendant's Reply in Support of Motion to Suppress (ECF No. 35). For the reasons discussed below, the Government's motion to file a surreply is granted and Defendant's motion to suppress should be denied.

15

**BACKGROUND**

16

17

18

19

20

21

In this case, Defendant is charged with being a felon in possession of a firearm and ammunition. (ECF No. 1). The gun and ammunition were seized during a traffic stop. (ECF No. 25 at 8; ECF No. 29 at 5-6). Police obtained a search warrant for the gun and ammunition after Defendant told police that they were in the car and police saw the gun. (ECF No. 25 at 6-8; ECF No. 29 at 5-6). Defendant now moves to suppress all evidence obtained during the traffic stop: the gun, ammunition, and Defendant's statements. (ECF No. 25 at 8).

22

23

24

25

In determining the facts of the case, the Court has considered the motion's briefing, the testimony of Officers Jason Marin and Peter Boffelli and arguments of counsel presented at an evidentiary hearing held on April 22, 2019, and the officers' bodycam footage. At the hearing, the Court stated that it would

1    consider the Government's surreply addressing caselaw cited in Defendant's reply.  (ECF No. 35).

2    Therefore, the Government's motion to file surreply is granted.

3        The parties have substantially different interpretations of the facts in this case.

4    **I.    Gang Unit Policies and Defendants' Theory of the Case**

5        Officers Marin and Boffelli, who conducted the traffic stop at issue in this case, are members of

6    Las Vegas Metropolitan Police Department's gang unit.  (ECF No. 29-2, bodycam footage admitted at the

7    evidentiary hearing as Government Ex. 1-1).  They are not typical traffic officers.  Statements made during

8    the traffic stop and at the hearing show that the routine practices taught to gang unit officers differ from

9    the standard actions taken by traffic officers.  (*Id.*; ECF No. 39[1]).  The officers' statements establish that,

10   to at least some degree, their motivations differ from those of typical traffic officers.  During the hearing,

11   Officer Marin testified that they were engaged in "proactive enforcement" in a designated high-crime area

12   on the night in question.  (ECF No. 39).  During the stop, Officer Marin commented to Defendant

13   regarding how many guns the officers had taken off the street during traffic stops.  (ECF No. 29-2).

14       Defendant's main argument presented throughout the briefing and at the evidentiary hearing is that

15   this case is based on a pretextual stop.  Defendant assert that the officers stopped Defendant, "an African-

16   American individual[,] simply because he was driving an expensive car" in a high-crime part of town.

17   (ECF No. 25 at 2).  Defendants argues that all of the facts in this case should be viewed through a lens of

18   "government abuse and harassment."  (*Id.*).

19       While portions of Defendant's rhetoric seems unnecessarily inflammatory, the Court understands

20   Defendant's position.  As members of the gang unit, Officers Marin and Boffelli do not seem to be

21   concerned solely with traffic violations.  There is the potential for officers in similar situations to

22   investigate what they consider to be suspicious circumstances through unconstitutional means, including

23   over-zealous traffic enforcement.  In addition, the routine used in traffic stops by Officers Marin and

24
      ───────────────────
      [1] ECF No. 39 is the minutes of the evidentiary hearing, which was recorded.
25

1   Boffelli, such as asking all drivers about weapons and drugs, could be used to convert even reasonable

2   traffic stops into unreasonable searches and seizures.

3       However, the Court must consider Defendant's case and motion to suppress on its own merits.

4   The Court cannot find that the Officers Marin and Boffelli acted improperly simply based on possible

5   motives or the potential that a policy was improperly applied.  The Court has carefully considered the

6   credibility[2] of the officers regarding their observations and actions in this particular case.  The Court

7   verified the facts, as much as possible, through its own viewing of the bodycam footage taken by the

8   officers.

9   **II.     Defendants' Alleged Traffic Violations**

10      **A.  Prior to the Bodycam Footage**

11      Officers Marin and Boffelli were patrolling in a car together on the night of May 21, 2018 near

12  Flamingo and Swenson, a "crime hot spot."  (ECF No. 39).  The incidents that first drew the officers'

13  attention to Defendant are not covered by the bodycam footage, though the officers' and Defendant's

14  discussion of them during the traffic stop does appear on the footage.  (ECF No. 29-2).  Officer Marin

15  testified that officers are not required to turn on their bodycams until they decide to initiate a stop.  (ECF

16  No. 39).  The Court finds this to be a reasonable policy, as it would be inefficient for bodycams to be

17  turned on at all times.

18      The officers noticed a white Range Rover pull into a Siegel Suites parking lot and then quickly

19  pull out.  (ECF No. 29 at 2).  Defendant had picked up a passenger, but the officers stated that they did

20  not see the passenger get picked up.  (ECF No. 29-2).  They thought it was strange that Defendant would

21

22

---

23  [2] The Government submitted sealed material to the Court regarding Officer Marin.  (ECF No. 37).  Defendant was given this material prior to the hearing, and was able to cross-examine Officer Marin regarding the material.  (ECF No. 39).  After

24  considering the material, the Court finds that it does not impact the Court's analysis of Officer Marin's credibility.  The circumstances presented in the material, which have not been fully developed at this time, are sufficiently different from the facts of this case.

25

1  pull into and out of a parking lot so quickly with no apparent purpose, and speculated that the driver was

2  nervous about seeing a patrol car.  (*Id.*).

3  The Court does not find it material whether the officers actually saw Defendant pick up a

4  passenger.  It is sufficient for the Court to find that the officers were interested in Plaintiff's behavior.  The

5  officers testified that seeing a nice vehicle in a Siegel Suites parking lot was unusual, and that particular

6  Siegel Suites was the location of "weekly" crimes.  (ECF No. 39).  Whether the officers' interest was

7  initially raised based on a quick entrance and exit of the parking lot or picking up a passenger, this does

8  not persuade the Court that the officers were seeking a pretext to stop Defendant's car.

9  According to the officers, Defendant pulled out of the parking lot into "the number two travel lane"

10  of Swenson, then quickly got into the right turn lane to get onto Flamingo without properly signaling.

11  (ECF No. 29-2).  Pursuant to NRS 484B.413(2), "[a] signal of intention to turn right or left, or otherwise

12  turn a vehicle from a direct course, shall be given continuously during not less than the last 100 feet

13  traveled in a business or residential district."  There was argument during the evidentiary hearing regarding

14  whether Defendant traveled 100 feet on Swenson between pulling out of the Siegel Suites parking lot and

15  turning onto Flamingo.  (ECF No. 39).  The parties and Court viewed the area on Google Maps.  (*Id.*).

16  Using Google Maps' distance measuring tool,[3] the distance traveled was over 300 feet.

17  The Court finds the officers' testimony to be credible on this point.  They testified that Defendant

18  left the parking lot quickly (ECF No. 39), which could have led him to turn into a lane that he did not

19  mean to turn into.  Defendant did not deny or seem surprised by Officer Marin's account of the incident

20  when they spoke during the traffic stop.  (ECF No. 29-2).

21

22

23

24

25  [3]  https://www.google.com/maps/place/Siegel+Suites+Swenson/@36.1151576,-115.1468842,19z/data=!4m5!3m4!1s0x80c8c
456dac256bb:0xf545dc86b299b868!8m2!3d36.115903!4d-115.146844.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

   **B.  Seen on Bodycam Footage, But Without Sound**

   The bodycam footage picks up when the officers pulled up behind Defendant in the right turn lane of the Swenson and Flamingo intersection.  (ECF No. 29-2).  It appears that the officers are running Defendant's license plate as they get behind him.  (*Id.*).

   Defendant turned right onto Flamingo during a red light.  (*Id.*).  A car traveling straight through the intersection, which would have had a green light, had to quickly decelerate behind Defendant to avoid running into him.  (*Id.*).  There is no sound during this portion of the footage, so it is not clear if there was any honking or screeching tires.  Pursuant to NRS 484B.307(8)(c), a vehicle in the right turn lane facing a red light, "[a]fter complying with the requirement to stop…may proceed into the intersection for a right turn…but must yield the right-of-way to pedestrians and other traffic proceeding as directed by the signal at the intersection."

   The officers have described it as Defendant "almost causing a collision," (ECF No. 29-4 at 4, search warrant application admitted at the evidentiary hearing as Government Ex. 2), while Defendant asserts the other car was "speeding through the intersection," but "did [not] stop short or appear to have any difficulty safely maneuvering around the white Range Rover which was apparently going the speed limit" (ECF No. 25 at 4).  Though it could be an exaggeration to say Defendant's actions "almost caus[ed] a collision," it does appear that Defendant failed to yield the right-of-way to the other car based on the Court's view of the bodycam footage.  The other car coming up behind Defendant, after he turned, had to slow down very quickly to avoid rear-ending the Defendant.  While it was going at a significant rate of speed, the other car had the green light and had the right to be going quickly. It does not appear that the other car was going so fast that Defendant would have been unaware of its presence or the need to yield.

**III.    Traffic Stop**

   After Defendant made the turn onto Flamingo, the officers turned on their lights to pull Defendant over.  (ECF No. 29-2).  Defendant did not pull over right away.  (*Id.*).  The officers stated that Defendant

1   was "slow to stop." (*Id.*). However, there were traffic cones placed to the right of Defendant's lane of

2   travel. (*Id.*). It appears that Defendant was searching for a safe gap in the cones before pulling over. (*Id.*).

3   As it was dark and cones are typically used to mark areas of construction, there does not appear to be a

4   significant delay in Defendant's actions in pulling over.

5        Officer Marin approached the car on the driver's side and Officer Boffelli approached on the

6   passenger side. (*Id.*). Officer Marin asked Defendant to roll down the back windows. (*Id.*). The windows

7   were darkly tinted and appear to be impossible to see through, especially at night. (*Id*.). The officers

8   testified that they needed to see into the vehicle to confirm the number of passengers to ensure the officers'

9   safety. (ECF No. 39). Both officers checked the back seat area before going to talk to Defendant and his

10  passenger. (ECF No. 29-2).

11       **A.  Officer Boffelli and the Passenger**

12       As an initial matter, Defendant's passenger is not a party in this case. His individual constitutional

13  rights are not at issue in this motion to suppress. However, his interaction with Officer Boffelli provides

14  context for Defendant's interactions with Officer Marin.

15       Officer Boffelli testified that it is standard procedure to engage passengers in this type of traffic

16  stop ("contact and cover"). (ECF No. 39). Officer Boffelli made small talk with the passenger, then asked

17  about his personal information such as name and social security number. (Defense Ex. A-1, bodycam

18  footage admitted at the evidentiary hearing). Officer Boffelli testified that the passenger did not have a

19  normal demeanor when discussing his personal information. (ECF No. 39). The passenger appeared

20  nervous and had to think twice about basic information like his date of birth. (*Id.*). When a records check

21  on the information the passenger provided did not turn up any results, Officer Boffelli removed the

22  passenger from the car and handcuffed him. (Ex. A-1). Officer Boffelli testified that he detained the

23  passenger until he could determine who he was, because not knowing who he was caused a safety concern.

24

25

1    (ECF No. 39).  The passenger was taken out of the car and handcuffed prior to Defendant being removed

2    from the car.  (Ex. A-1).

3            **B.  Officer Marin and Defendant**

4            Officer Marin began by talking to Defendant about why he was pulled over—Defendant failed to

5    properly signal a lane change and almost caused an accident with his turn.  (ECF No. 29-2).  Defendant

6    commented, "I seen" the events.  (*Id*.).  Defendant volunteered that he had been to Court earlier that day

7    to take care of a problem with his license.  (*Id*.).

8            Officer Marin asked for Defendant's license, which he provided.  (*Id.*).  Officer Marin asked

9    Defendant to move a card placed in the front windshield to see the car's VIN.  (*Id.*).  When moving the

10   card did not reveal the VIN, Officer Marin opened the driver-side door to see the VIN.  (*Id*.).  Officer

11   Marin testified it was standard procedure to verify the driver's and car's information in traffic stops.  (ECF

12   No. 39).

13           Officer Marin asked Defendant if he had weapons, drugs, or anything illegal in the car.  (ECF No.

14   29-2).  Defendant said no.  (*Id*.).  Officer Marin asked if Defendant would mind officers search the car,

15   "if it comes to it," but stated that he was not saying for sure that it could come to it.  (*Id*.).  Defendant

16   stated again that there was nothing in the car.  (*Id*.).

17           Officer Marin asked Defendant several more times about getting consent to search the car, and

18   Defendant stated consistently that there was nothing in the car.  (*Id.*).  Officer Marin testified that these

19   questions are routine at all traffic stops he does.  (ECF No. 39).  At one point, Defendant asked his

20   passenger if he had anything on him. (ECF No. 29-2).  Defendant said he had never been asked for consent

21   to search his car before during a stop, and Officer Marin explained they were with the gang unit and did

22   things differently than other officers who may have stopped Defendant in the past.  (*Id*.).  Officer Marin

23   said Defendant was acting nervous, and Defendant replied that he knew he "got" a warrant issue with his

24   license.  (*Id*.).

25

1    Defendant stated that there was nothing in the car, but he did not know about his rights, whether

2    he should just let the officers search the car. (*Id.*). Officer Marin stated that the officers could not just

3    trust what Defendant was saying about not having weapons or drugs as the absolute truth, and Defendant

4    could either say "yes" or "no" to letting officers search his car, but the lack of answer was making Officer

5    Marin concerned. (*Id.*). Officer Marin asked one last time if there was anything in the car—Defendant

6    responded no—and whether the officers could search the car—Defendant responded no. (*Id.*).

7    Defendant argues that he was being "badgered" about having weapons or drugs in the car, which

8    would not happen at a typical traffic stop. (ECF No. 25 at 5). The Court finds that Defendant was not

9    being "badgered"—Officer Marin was asking a specific question about consent and was getting an answer

10    to a different question about whether there was anything illegal in the car. The Court understands that

11    Defendant may have been confused about the question. However, Defendant characterizes Officer

12    Marin's attempt to explain the question as evidence of badgering, which the Court does not accept.

13    There was substantial discussion at the hearing regarding whether Defendant avoided eye contact

14    with Officer Marin. (ECF No. 39). Viewing the bodycam footage, Defendant maintained eye contact

15    with Officer Marin for portions of their conversation, but also looked away at several conspicuous

16    moments, such as when Officer Marin said he thought Defendant was avoiding answering the consent

17    question. (ECF No. 29-2).

18    **IV.    Defendant Taken Out of the Car**

19    Immediately after Defendant denied consent to search the car, Officer Marin told Defendant that

20    he was going to have to get out of the car because of how he was acting—nervous and avoiding the

21    questions. (ECF No. 29-2). Officer Marin testified at the evidentiary hearing that he told Defendant to

22    leave the car based on the potential warrant problem and Defendant asking his passenger if he had anything

23    on him. (ECF No. 39). Officer Marin testified that he took Defendant out of the car for safety reasons,

24    as he would in other cases when there were suspicions about identification or weapons in the vehicle.

25

1   (*Id.*).  Officer Marin saw Defendant's passenger being removed from the car before telling Defendant to

2   leave the car, but Officer Marin did not know why at the time.  (*Id.*).

3       When telling Defendant to leave the car, Officer Marin stated that Defendant was not in trouble or

4   under arrest.  (ECF No. 29-2).  Officer Marin and Defendant walked back to the front of the officers' car.

5   (*Id*).  Though Defendant argues he was marched back to the car in an oppressive manner (ECF No. 39), it

6   appears from the bodycam footage that there was a concern about being close to traffic, and standing

7   between the cars was safer and more convenient.  (ECF No. 29-2).

8       When they got to the officers' car, Defendant stated, "Officer, just cuff me."  (*Id.*).  Officer Marin

9   cuffed Defendant, then asked him why he made that comment and what he had on him.  (*Id.*).  Officer

10  Marin did not *Mirandize* Defendant before asking these questions.  (*Id.*).  Officer Marin testified that he

11  thought Defendant could have a weapon on him or in the car.  (ECF No. 39).  Defendant stated that there

12  was a gun pushed down between the driver seat and middle console of his car.  (ECF No. 29-2).

13      Officer Marin went to check the car and saw the gun.  (*Id.*).  Officer Marin performed a records

14  check and found that Defendant was an ex-felon.  (*Id.*).  Officer Marin *Mirandized* Defendant and asked

15  him about the gun.  (ECF No. 29-3, bodycam footage admitted at the evidentiary hearing as Government

16  Ex. 1-2).  Defendant said it belonged to his child's mother, but he had it because he did not trust the area.

17  (*Id.*).  Officer Marin said they were getting a search warrant for the car, and asked Defendant if they would

18  find anything else while searching.  (*Id.*).  Defendant stated that there was a "clip" under the driver's seat.

19  (*Id.*).

20  **V.    Search Warrant**

21      Officer Boffelli obtained the search warrant telephonically.[4]  (ECF No. 29-4).  Officer Boffelli

22  stated that officers observed the car failing to signal and failing to yield right of way while turning.  (*Id.*).

23

24  [4] Though Officer Boffelli did not explicitly identify what information in the application was provided to him by Officer Marin, the Court finds there are sufficient indications throughout the application regarding which statements were made by and to

25  Officer Marin.

Defendant "was acting nervous…and would not make eye contact with Officer Marin." *Id.* at 4). "Officer Marin asked [Defendant] to st[e]p out of the vehicle, due to his nervous demeanor and [Defendant's] statement was that he may have a traffic warrant." (*Id.*). "After stepping out of the vehicle, [Defendant] stated, not verbatim, that Officer Marin, just handcuff me. Officer Marin placed [Defendant] in mechanical restraints and [Defendant] spontaneously uttered that there was a firearm in between the driver's seat and center console." (*Id.*).

## DISCUSSION

The Fourth Amendment protects the right of people to be secure against unreasonable searches and seizures. Though the Fourth Amendment does not specifically preclude admission of evidence obtained in violation of its provisions, the courts enforce "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139-40 (2009).

Defendant argues that (1) the stop was improper at its inception because of a pretextual motive, (2) the stop because unreasonable due to Officer Marin's questioning, (3) Officer Marin violated Defendant's *Miranda* rights, and (4) Officer Boffelli made misrepresentations and omissions in the search warrant application.

**I.      Valid Traffic Stop or Pretext**

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "Where the circumstances of a vehicle stop, viewed objectively, are sufficient to justify the detention based on either reasonable suspicion or probable cause that a crime has been committed, the subjective intent of the law enforcement officers is irrelevant." *United States v. Orozco*, 858 F.3d 1204, 1210 (9th Cir. 2017). "[P]retext arises out of the fact that the evidence is found in a search which would not have occurred at all." *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017) (quoting 3 Wayne R. LeFave, Search

1    and Seizure 902 (5th ed. 2012)). "[I]n order to prove that a stop is unreasonably pretextual, a defendant

2    must show that the stop would not have occurred in the absence of an impermissible reason." *Id.* (quoting

3    *United States v. Maestas*, 2 F.3d 1485, 1489 (10th Cir. 1993)).

4         The Court finds the officers had reasonable suspicion that two traffic violations took place, as

5    discussed above. The officers testified credibly that Defendant failed to properly signal a lane change and

6    yield to traffic in making a right turn. The Court agrees with the officers' testimony regarding the right

7    turn based on its own viewing of the bodycam footage. Though the failure to signal a lane change was

8    not captured on bodycam footage, Defendant's reaction to Officer Marin's account of the incident was

9    recorded. (ECF No. 29-2). Defendant did not deny or seem surprised by Officer Marin's account.

10        Defendant argues that there are several factors showing that the stop was pretextual: (1) the officers

11   were suspicious of Defendant merely because he was an African-American driving a nice car in a high-

12   crime area, (2) the officers ran Defendant's plate before pulling him over, and (3) the officers made

13   Defendant roll down his windows before speaking with him. (ECF No. 25 at 3-5, 10-15; ECF No. 34 at

14   4-6).

15        The officers testified that seeing a nice car in the Siegel Suites parking lot was suspicious. (ECF

16   No. 39). However, the Court is not persuaded that merely noticing Defendant's car meant that the officers

17   "would have used any traffic infraction, however slight, as an excuse…to stop the car." *United States v.*

18   *Daniel*, 804 F. Supp. 1330, 1335 (D. Nev. 1992). The officers also testified that they had no prior

19   knowledge of Defendant prior to the stop, and could not even see Defendant prior to the stop. (ECF No.

20   39). Simply running Defendant's plate is not a suspicious circumstance, as there is no indication that the

21   officers actually obtained any potentially incriminating information about the car prior to pulling

22   Defendant over. Simply asking the driver to roll down the windows to see if there are any passengers is

23   not a suspicious circumstance. Defendants' windows were impossible to see through, and it is reasonable

24   that officers would want to know how many passengers are in a car before they engage the driver.

25

1    Therefore, the Court finds that the traffic stop was not pretextual at its inception.

2    **II.    Scope of the Traffic Stop**

3    **A.  Officer Marin's[5] Questions**

4    "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the

5    seizure's 'mission'—to address the traffic violation that warranted the stop…and attend to related safety

6    concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). "[T]he Fourth Amendment

7    tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." *Id.* "An officer

8    conducting a traffic stop may detain the motorist so long as is necessary to check his driver's license and

9    registration, ask a few perfunctory questions, and write out a ticket." *Daniel*, 804 F. Supp. At 1334. "Any

10   expansion of the scope of the stop to include investigation of other suspected illegal activity will only be

11   allowed if the officer has a reasonable, articulable suspicion that other criminal activity is afoot." *Id.*

12   "An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert

13   the encounter into something other than a lawful seizure, so long as those inquiries do not measurably

14   extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Officers can question

15   individuals about weapons in a reasonable manner for their own safety. *United States v. Willis*, 431 F.3d

16   709, 717 (9th Cir. 2005).

17   Officer Marin had discussed the alleged traffic violations with Defendant and obtained

18   Defendant's driver's license before asking Defendant questions about drugs or weapons in the car. (ECF

19   No. 29-2). However, based on Defendant's comment that he either currently or very recently had a

20   problem with his license (*Id.*), Officer Marin would have been justified in running a records check on

21   Defendant prior to issuing a citation. Prior to running a records check, Officer Marin asked Defendant

22

23   _____

24   [5] Defendant's passenger was also questioned during the traffic stop regarding his identity. (Ex. A-1). However, the passenger
     is not a party in this case, and his individual civil rights are not at issue in this case. The Court also notes that the passenger's
     questioning appears to have been completed prior to Defendant's questioning. (*Id.*). Therefore, the passenger's questioning

25   did not lengthen the duration of the traffic stop.

1  about whether there was contraband in the car and whether Defendant would consent to officers searching

2  the car "if it comes to it."  (*Id.*).

3        Officer Marin's initial question about whether there were any weapons or drugs in the car is proper

4  in the context of the traffic stop.  The question would not measurably extend the duration of the stop, and

5  was a reasonable method to help ensure the officers' safety.  The more difficult analysis relates to Officer

6  Marin's questions about obtaining consent to search the car "if it comes to it."  There was very little

7  indication, if any, at this point that there would be any justification to search Defendant's car.  However,

8  simply asking about future potential consent would not generally extend the duration of the stop—an

9  individual can simply answer "yes" or "no."

10        In this case, Defendant did not answer "no" regarding consent, which lengthened Officer Marin's

11  questioning as he tried to obtain a clear answer.  Defendant continued to assert that there was nothing in

12  the car without saying whether officers would have consent to search the car.  (ECF No. 29-2).  Once

13  Defendant clearly stated that he would not consent to officers searching the car, Officer Marin stopped

14  questioning Defendant.  (*Id.*).

15        Under the particular facts of this case, the Court finds that Officer Marin's questioning was

16  properly within the scope of the traffic stop.  While the questions were unrelated to the subject of the

17  traffic stop, they were related to officer safety and did not measurably extend the duration of the stop.

18  Any delay was caused by Defendant's inability or unwillingness to answer Officer Marin's question.  Once

19  Officer Marin obtained a clear answer, the questioning stopped.

20  **B.  Defendant's[6] Removal from the Vehicle**

21  "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may

22  order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of

23  unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977).  Handcuffing

24

---

25  [6] Defendant's passenger was also removed from the vehicle.  (ECF No. 29-2).  However, the passenger is not a party in this case, and his individual civil rights are not at issue in this case.

1  during a *Terry* stop does not necessarily convert the stop into an arrest if not excessive under the

2  circumstances. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

3      Officer Marin stated on the bodycam footage and during the hearing that he removed Defendant

4  from the car due to safety concerns based on (1) Defendant appearing nervous and avoiding answering

5  Officer's Marin's questions, (2) Defendant's potential warrant problem, and (3) Defendant asking his

6  passenger if he had anything on him. (ECF Nos. 29-2, ECF No. 39). The Court finds that these concerns,

7  taken together, justified Defendant's removal from the car. Officer Marin was going to run a records

8  check on Defendant based on the potential warrant problem, which would require Officer Marin to return

9  to his vehicle. At this point, Officer Boffelli had removed the passenger from the car and was also heading

10  back to the officers' vehicle. (Ex. A-1). Officer Marin would have had to leave Defendant in the car

11  completely unsupervised while running the records check. Officer Marin had safety concerns regarding

12  leaving Defendant alone in the car, as Defendant appeared nervous about what was in the car. Therefore,

13  Officer Marin was justified in removing Defendant from the car.

14      The Court did have concerns regarding the timing of Defendant's removal from the car. Defendant

15  was removed immediately after denying his consent for officers to search the car. (ECF No. 29-2). This

16  had the potential to make Defendant think that his removal from the car was a result of his denial of

17  consent. However, Officer Marin told Defendant his reasons for the removal were safety concerns. (*Id.*).

18  In addition, Officer Marin did not mention any intention to search the car after removing Defendant from

19  the car, until after the gun was located. Finally, when telling Defendant to leave the car, Officer Marin

20  stated that Defendant was not in trouble or under arrest. (*Id.*). Taking the facts as a whole, the Court finds

21  Officer Marin was justified in removing Defendant from the car.

22      Therefore, the Court finds that the officers' actions in questioning Defendant and removing him

23  from the vehicle did not exceed the proper scope of a traffic stop.

24

25

**III.    Defendant's Statements about the Gun Pre-*Miranda* Warning**

"*Miranda* warnings are not required 'when police officers ask questions reasonably prompted by a concern for the public safety.'" *United States v. McKee*, 157 F. Supp. 3d 879, 890 (D. Nev. 2016), *aff'd,* 752 F. App'x 462 (9th Cir. 2018) (quoting *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir.2002)). "In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from immediate danger.'" *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002) (quoting *United States v. Carrillo,* 16 F.3d 1046, 1049 (9th Cir.1994)).

The Court finds that Officer Marin was not required to give Defendant *Miranda* warnings prior to asking why Defendant asked to be handcuffed and what Defendant had on him.  Assuming *arguendo* that Defendant was in custody at that time,[7] Officer Marin's questions were prompted by an objectively reasonable need to protect the police and public from immediate danger.  Officer Marin could not have known what prompted Defendant to tell Officer Marin to handcuff him, but there was the obvious potential for Defendant to have something dangerous on his person.  Officer Marin testified at the hearing that having an individual ask to be handcuffed is not a normal occurrence, and it made Officer Marin concerned that there was a weapon on Defendant or in the car.  (ECF No. 39).  Though Officer Marin did not specifically ask whether Defendant had a weapon on him, it is clear that Officer Marin's questions were directed at determining whether Defendant had something dangerous in his possession.

Therefore, the Court finds that Defendant's two pre-*Miranda* statements[8] regarding the gun should not be suppressed.

---

[7] Though Defendant was handcuffed, it is not clear that Defendant was in custody at the time he made his first statement about the gun.  He had only been handcuffed because he asked Officer Marin to do so, after Officer Marin told Defendant that he was not under arrest.  (ECF No. 29-2).

[8] Defendant made other statements about the gun and ammunition after receiving a *Miranda* warning.  (ECF No. 29-3).

**IV.   Search Warrant**

"Under *Franks*, a criminal defendant has the right to challenge the veracity of statements made in support of an application for a search warrant." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017). "To prevail on a *Franks* challenge, the defendant must establish two things by a preponderance of the evidence: first, that 'the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant[,]' and second, that the false or misleading statement or omission was material, *i.e.*, 'necessary to finding probable cause.'" *Id.* (quoting *United States v. Martinez–Garcia*, 397 F.3d 1205, 1214-15 (9th Cir. 2005)).

**A.  Alleged Omissions**

Defendant argues that Officer Boffelli omitted information that the officers were racially profiling Defendant and their "normal practices as gang unit officers was to conduct searches of cars one way or another." (ECF No. 25 at 7, 11-12).  Officer Boffelli did not mention Defendant entering and leaving a parking lot prior to his failure to signal a lane change or Defendant's race in his application.  (ECF No. 29-4).  The Court finds that this information was not material.  Officers pulled Defendant over after two apparent traffic violations, as discussed above.  Background information regarding how they first noticed Defendant would not impact the Justice of the Peace's probable cause determination, nor would Defendant's race.

Defendant also asserts that Officer Boffelli should have included that the officers asked Defendant to roll down his windows prior to engaging with him.  (ECF No. 25 at 7).  As discussed above, the request was a reasonable measure to ensure the officers' safety, and would not be material to the Justice of the Peace's probable cause determination.

Finally, Defendant argues that Officer Boffelli should have given the specific amount of time it took Defendant to stop rather than simply saying he was "slow to stop."  (ECF No. 39).  The Court finds

1    that the exact number of seconds Defendant took to stop would not be material to the Justice of the Peace's

2    probable cause determination.

3        **B. Alleged Misrepresentations**

4        Officer Boffelli stated that Defendant "would not make eye contact with Officer Marin." (ECF

5    No. 29-4 at 4).  Defendant argues that this misrepresents the facts of the stop, as Defendant made

6    significant eye contact with Officer Marin.  (ECF No. 39).  The Court acknowledges that Officer Boffelli's

7    statement is an exaggeration of Defendant's avoidance of making eye contact.  (ECF No. 29-2).  However,

8    the Court finds that this was not an intentionally or recklessly made misrepresentation.  The Court notes

9    the potential difficulties in formatting statements during a telephonic search warrant application, without

10    the benefit of editing words on a paper.  There is not a significant difference between stating "would not

11    make" and "avoided making" that would indicate Officer Boffelli intended to mislead the Justice of the

12    Peace or was recklessly disregarding the truth.

13        Officer Boffelli also stated that "Officer Marin asked [Defendant] to st[e]p out of the vehicle, due

14    to his nervous demeanor and [Defendant's] statement was that he may have a traffic warrant." (ECF No.

15    29-4 at 4).  Defendant argues this misstated Defendant's actual words, which were that he had a warrant

16    earlier but had taken care of it.  (ECF No. 34 at 4).  At one point during the stop, Defendant said that he

17    had taken care of a warrant earlier that day.  (ECF No. 29-2).  However, Defendant also stated that he

18    "got" a warrant, which could be interpreted as a present tense statement.  (*Id.*).  The Court finds that this

19    was not an intentionally or recklessly made misrepresentation by Officer Boffelli.  Any misstatement was

20    caused by understandable confusion, which was shared by the parties and Court in watching the bodycam

21    footage of Defendant's statements.

22        Defendant also asserts that Officer Boffelli's statement regarding Defendant's removal from the

23    car misrepresented "that they ordered Mr. Phillips out of the car after he repeatedly refused to consent to

24    a search of his vehicle." (ECF No. 25 at 7).  There is no mention in the warrant application regarding

25

1    Officer Marin's questioning about consent.  (ECF No. 29-4).  As previously discussed, the Court had

2    concerns regarding the timing of Defendant's removal from the car in relation to his denial of consent.

3    However, Defendant was removed from the car due to safety concerns rather than his denial of consent.

4    (ECF No. 29-4).  In addition, Defendant did not "repeatedly" refuse to consent—he refused once.  (*Id.*).

5    The Court finds that Defendant's denial of consent would not be material to the Justice of the Peace's

6    probable cause determination.

7         Finally, Defendant takes issue with Boffelli's statement that Defendant "spontaneously uttered that

8    there was a firearm in between the driver's seat and center console" without mentioning Officer Marin's

9    questions regarding why Defendant asked to be handcuffed and what Defendant had on him.  (ECF No.

10   29-4 at 4; ECF No. 39).  The Court acknowledges that Defendant's statement about the gun was prompted

11   by Officer Marin, and was not "spontaneously uttered."   However, the Court finds that this

12   misrepresentation, even if intentionally or recklessly made, was not material.  As discussed above, Officer

13   Marin's questions were prompted by an objectively reasonable need to protect the police and public from

14   immediate danger.  Officer Marin's questions and Defendant's did not violate *Miranda*.  Whether

15   Defendant's statement was prompted or "spontaneously uttered," it could still be properly used to support

16   a search warrant.

17        Therefore, the Court finds that the search warrant application did not contain any material

18   omissions or misrepresentations.

                                    **CONCLUSION**

19

20        Both parties asked the Court to consider the totality of the circumstances.  Having done so, the

21   Court concludes that the evidence should not be suppressed in this case.

22        Defendant makes several compelling arguments for challenging a policy for officers to ask all

23   individuals they stop about contraband and consent to search their car.  It could have the potential to

24

25

1    manufacture vehicle searches that violate the Fourth Amendment. However, the facts in this particular

2    case do not fit Defendant's arguments.

3           This is not a case where an individual was harassed about giving consent to search a car and pulled

4    from a vehicle and handcuffed with no justification. This is a case where (1) the Court agrees with the

5    officers that there was probable cause to believe that at least one traffic violation occurred, (2) Defendant

6    was unable or unwilling to answer a question about consent, (3) Defendant was taken from a vehicle due

7    to articulable safety concerns, and (4) Defendant told an officer to handcuff him before stating there was

8    a gun in the car. To accept Defendant's argument that the officers in this case were going to search the

9    vehicle no matter the circumstances, the Court would have to ignore what actually happened in this case.

10   The Court cannot speculate what may have happened if Defendant had clearly denied consent in response

11   to Officer Marin's first question or had not said, "Officer, just cuff me." Under the facts of this particular

12   case, suppression is not justified.

13          ACCORDINGLY, and for good cause shown,

14          IT IS HEREBY ORDERED that the Government's Motion to File Surreply to Defendant's Reply

15   in Support of Motion to Suppress (ECF No. 35) is GRANTED.

16          IT IS HEREBY RECOMMENDED that Defendant's Motion to Suppress (ECF No. 25) should be

17   DENIED.

18          DATED this 29th of April, 2019.

19

20                                                           _____
                                                             CAM FERENBACH
21                                                           UNITED STATES MAGISTRATE JUDGE

22

23

24

25